## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Case No.:   6:20-cv-01562

AMBER ELKINS, LORI-ANN RIDLEY,
SHERYL DOBBINS,
JAVIER VALENCIA, PAULA BROOKS,
PHORNPHAN CHUBCHAI,
EMILY MICHELLE MCGOLDRICK, individually
and on behalf of all others similarly
situated persons,

        Plaintiffs,

vs.                                  **CLASS REPRESENTATION**

ABBVIE, INC. f/k/a ALLERGAN, INC., f/k/a
ALLERGAN plc, and f/k/a ZELTIQ AESTHETICS,
INC.

        Defendant.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs on behalf of themselves and all other similarly situated class members, file this class action Complaint against Defendant AbbVie, Inc., formally known as Allergan plc, also formally known as Allergan Inc., also formally known as Zeltiq Aesthetics, Inc. and allege as follows:

### NATURE OF THE PROCEEDINGS

1. This class action lawsuit arises from a popular non-invasive fat reducing medical device called the CoolSculpting System, which has the ability to cause permanent deformities to a person's body.

2. Defendant advertised and continues to advertise CoolSculpting as a "nonsurgical" procedure intended to reduce stubborn fat bulges "in the areas that bother you most."

CoolSculpting promises "up to 20-25% reduction in fat layer thickness after a single session."[1]

3. Defendant knew since at least 2011 that the CoolSculpting device can cause users to develop a condition called Paradoxical Adipose Hyperplasia (PAH), which results in the *opposite effect* of the medical device's advertised purpose. The CoolSculpting device can *permanently* damage the tissue in the area it targets to reduce, creating a deformity on the patient's body much *larger* in size than the original "stubborn fat bulge." The condition does not resolve on its own, and unlike regular fat tissue, tissue affected by PAH does *not* respond to weight loss. Thus, the only method of removing PAH is through invasive surgery. The condition is solely attributed to the CoolSculpting device.

4. Since the device went on the market, Defendant has received thousands of reports of CoolSculpting users that have developed Paradoxical Adipose Hyperplasia (PAH) after undergoing the CoolSculpting procedure.

5. Despite knowing about the severity, permanency, and frequency of the condition, Defendant manipulated, in its favor, important information regarding PAH to induce prospective patients to undergo the CoolSculpting procedure. It did so by making misrepresentations about PAH to CoolSculpting providers and concealing the number of patients that have developed PAH, causing CoolSculpting providers to believe that the condition is not as serious, permanent, and frequent as Defendant knew it to be.

6. As the result of Defendant's conduct, the Plaintiffs' CoolSculpting providers were not adequately informed of the serious risk of undergoing the CoolSculpting procedure and, therefore, did not advise the Plaintiffs about the potential of developing PAH.

---

[1] https://www.coolsculpting.com/coolsculpting/

7.   Consequently, Plaintiffs unknowingly subjected themselves to CoolSculpting procedures and subsequently developed permanent deformities on their bodies, requiring multiple invasive surgeries to remove.

## PARTIES

8.   Plaintiff, **Amber Elkins**, is an individual and resident of Florida. In May 2016 and July 16, 2016, she underwent the CoolSculpting procedure in Orlando, Florida.

9.   Plaintiff, **Lori-Ann Ridley**, is an individual and resident of Florida. In December 2018 and February 2019, she underwent the CoolSculpting procedure in Naples, Florida.

10. Plaintiff, **Sheryl Dobbins**, is an individual and a resident of Maine. In March 2019, she underwent the CoolSculpting procedure in Miami Beach, Florida.

11. Plaintiff, **Javier Valencia**, is an individual and a resident of New York. In July 2018, he underwent the CoolSculpting procedure in Stony Brook, New York.

12. Plaintiff, **Paula Brooks**, is an individual and a resident of Massachusetts. In May 2019, she underwent the CoolSculpting procedure in Hyannis, Massachusetts, and in August 2019, she underwent another CoolSculpting procedure in Mt. Pleasant, South Carolina.

13. Plaintiff, **Phornphan "Lisa" Chubchai**, is an individual and a resident of California. In December 2018, April 2019, and June 2019, she underwent the CoolSculpting procedure in Fresno, California.

14. Plaintiff, **Emily Michelle McGoldrick**, is an individual and a resident of California. From March 2018 through October 2018, she underwent multiple CoolSculpting procedures in Pasadena, California.

15. Defendant, **AbbVie, Inc.** is a corporation formed under the laws of Delaware with a principal place of business at 1 North Waukegan Road, North Chicago, IL 60064. On May

8, 2020, AbbVie Inc. acquired Allergan plc., Allergan, Inc., and Zeltiq Aesthetics, Inc. and is the current owner of the CoolSculpting medical device.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a class action lawsuit in which the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and is a class action in which the majority of the class members are citizens of a different state than the Defendant.

17. This Court has personal jurisdiction over Defendant because it transacts a large amount of its business and has substantial contacts within the State of Florida, in the jurisdiction of this Court, such that maintenance of this action is consistent with traditional notions of fair play and substantial justice.

18. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and the Defendant is subject to this Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

19. Zeltiq Aesthetics, Inc., either directly or through its agents, servants, and employees, created, designed, manufactured, labeled, marketed, advertised, distributed, and sold its CoolSculpting System medical device to be used on individuals to induce lipolysis (the breaking down of fat cells) in the body.

20. On April 28, 2017, Allergan plc and Allergan Inc. acquired Zeltiq Aesthetics, Inc. for the purchase price of $2.48 billion. Since Allergan's acquisition of Zeltiq, Allergan held itself out to the world as the owner of the CoolSculpting System and had apparent dominion and

control over all aspects of the CoolSculpting business, including the manufacturing, labeling, advertising, distribution, and sale of the medical device and its consumables.

21. On May 8, 2020, AbbVie, Inc. acquired Allergan plc, Allergan, Inc., and Zeltiq Aesthetics, Inc. for the purchase price of $63 billion and took control over all of the companies' assets and liabilities, it is now the owner of the CoolSculpting System medical device and is financially responsible for the claims set forth in this lawsuit.

## ABOUT COOLSCULPTING

22. CoolSculpting is a body contouring procedure that is supposed to work by using a process called Cryolipolysis®, which freezes fat cells and programs them to die over the course of several months.

23. The Cryolipolysis® process was developed and patented by Drs. Richard Rox Anderson and Dieter Manstein at Harvard University and Massachusetts General Hospital in the early 2000's.[2]

24. In 2005, Defendant made a deal with Massachusetts General Hospital for an exclusive license to manufacture a medical device based on this patented process.[3]

25. Defendant developed a medical device called CoolSculpting System to administer the Cryolipolysis procedure on patients seeking to reduce stubborn fat without surgery.

26. The CoolSculpting System device consists of several parts, including the main control unit (the body of the device), the applicators (arms extending from the body), gel pads for the applicators, massage function, consumable cards, liners, pretreatment skin wipes, and securement systems.

---

[2] *Zeltiq Aesthetics, Inc. v. Daron Scherr, M.D. et. al.,* Case No.: 2:15-cv-00186 ¶10.
[3] *Id.* at ¶¶7, 10.

27. The concept of Cryolipolysis® is based on a theory that fat tissue is more vulnerable to cold temperatures than the skin, therefore if cold is applied to a person's unwanted fat bulge, the cold temperature will kill the fat cells and leave the skin intact. The fat cells are not killed immediately but are rather "programmed" to die over time. Persons undergoing the procedure are expected to see "results" 1-3 months after the procedure, as the fat cells wither away in the treatment area.

28. CoolSculpting's premise is based on the fact that the human body has a certain number of fat cells, that does not change during the course of a person's life. The CoolSculpting device can reduce fat by reducing the number of fat cells through this cold-assisted lipolysis process.

29.  Although the CoolSculpting device has other possible indications for use, such as cooling or heating with the device to minimize temporary pain and provide temporary relief from muscle aches, improve circulation, and temporarily reduce the appearance of cellulite with an optional massage function, the CoolSculpting device's primary purpose is for Cryolipolysis® treatments or "cold-assisted lipolysis (breakdown of fat)."[4]

30. The U.S. Food and Drug Administration ("FDA") cleared Defendant's Cryolipolysis® CoolSculpting device for the performance of Cryolipolysis® services to the following areas: upper arm, bra fat, back fat, banana roll (underneath the buttocks), thighs, abdomen, and flank ("love handles"), submental, and submandibular areas.[5]

---

[4] Zeltiq Aesthetics, Inc. (2015). *Annual 10-K Report.* Page 19/153. Retrieved from https://www.sec.gov/Archives/edgar/data/1415336/000162828016012690/zltq-12312015x10k.htm.

[5] Department of Health and Human Services, Food and Drug Administration. Dermal Cooling Pack/Vacuum/Massager, 510(k), K193544: ZELTIQ Coolsculpting System. Indication for Use. Retrieved from https://www.accessdata.fda.gov/cdrh_docs/pdf19/K193566.pdf.

31. The CoolSculpting device is the only medical device in the United States with FDA clearance to offer body contouring services via Cryolipolysis®.

32. The CoolSculpting device is a Class II prescription medical device that should only be sold to physicians.

33. In order to facilitate Cryolipolysis®, the CoolSculpting device's suction applicators are applied to a person's body and cool the treatment area for 30 to 60 minutes. Each application of the applicator is called a "cycle." A person may undergo multiple cycles in one CoolSculpting session, depending on the size of the area they desire to treat with Cryolipolysis®.

34. CoolSculpting is a relatively expensive procedure. An average session of CoolSculpting costs $2,000-$4,000, at an average price per cycle (one application of the device) of $650-$800.

## COOLSCULPTING ADVERTISING

35. Defendant has extensively marketed and promoted its CoolSculpting system directly to the public and continues to do so today.[6]

36. At all times material, Defendant used the same or similar language and messaging throughout its advertisement materials.

37. CoolSculpting is advertised and marketed as a *non-invasive* and *surgery-free* procedure that is an alternative to liposuction and other fat reducing surgeries.

---

[6] Zeltiq Aesthetics, Inc. (2015). *Annual 10-K Report.* Page 6/153. Retrieved from https://www.sec.gov/Archives/edgar/data/1415336/000162828016012690/zltq-12312015x10k.htm.

> CoolSculpting® is not a weight-loss treatment—it's the #1 nonsurgical fat reduction treatment used by doctors.°
>
> ° CoolSculpting is the treatment doctors use most for nonsurgical fat reduction.

38.

39. CoolSculpting promises to reduce fat up to 20-25% after only one session.

### What is CoolSculpting®?

The unique CoolSculpting® fat-freezing technology is a nonsurgical, scientifically proven way to reduce pockets of fat in trouble spots such as the abdomen, flanks, or under the chin in as little as one session.*

**LEARN HOW IT WORKS**

*Up to 20-25% reduction in fat layer thickness after a single session. Results may be seen as early as 1 to 3 months after treatment.

Model. Not a patient.

40.

41. CoolSculpting claims that the fat reduction after the procedure is "long lasting" and that the device permanently kills the fat cells. It boasts, "Our experts spent years developing the treatment, which features one-of-a-kind technology that quite literally freezes and kills fat cells."[7]



Farewell treated fat cells.

It's technical name is cryolipolysis, which is just a science-y way to say fat freezing. Our experts spent years developing the treatment, which features one-of-a-kind technology that quite literally freezes and kills fat cells.

Model. Not a patient.

42.

---

[7] https://www.coolsculpting.com/what-is-coolsculpting/

43. The CoolSculpting System has received substantial press coverage in the national media since its clearance by the FDA for non-invasive, cosmetic, body-contouring, including features on television shows such as The Today Show, Good Morning America, The CBS Early Show, The Rachel Ray Show, The Dr. Oz Show, Extra, Nightline, The Doctors, and E! News, and in magazines such as O, Elle, Marie Claire, Allure, Men's Fitness, Town & Country, Elevate, W, and Vie.[8]

44. Defendant operated and still operates a website www.coolsculpting.com where it also advertises CoolSculpting directly to the public and refers prospective patients to CoolSculpting providers in their geographical area.

45. In addition to intensely marketing the CoolSculpting device to the general public, Defendant aggressively pursued doctor's offices, medical spas, laser hair removal clinics, and other cosmetic procedure establishments to sell its CoolSculpting System device and induce them to add CoolSculpting to their list of medical procedures provided to their cosmetic patients.[9]

46. Defendant also spent millions of dollars partnering with individual CoolSculpting providers, paying for local ads that promote the CoolSculpting services at the providers' clinics.

**DEFENDANT'S CONTROL OVER THE COOLSCULPTING PROVIDERS**

47. Defendant's relationship with CoolSculpting providers differs from traditional relationships between medical device manufacturers and their customers because

---

[8] *Zeltiq Aesthetics, Inc. v. Daron Scherr, M.D. et. al.,* Case. No.: 2:15-cv-00186. ¶15.
[9] Zeltiq Aesthetics, Inc. (2015). *Annual 10-K Report.* Page 6/153. Retrieved from https://www.sec.gov/Archives/edgar/data/1415336/000162828016012690/zltq-12312015x10k.htm.

Defendant controlled and continues to control all aspects of the CoolSculpting providers' CoolSculpting business. Through a number of tactics, Defendant effectively took away the CoolSculpting providers' autonomy in how they use the medical device, turning the CoolSculpting providers into the Defendant's agents.

48. The CoolSculpting medical device is specifically programmed to only function with the use of consumable cards, called "cycles," which CoolSculpting providers *must* buy from Defendant to operate the medical device.[10] "A cycle is an authorization to perform one procedure to one specific area on the body; [providers] can only perform a treatment if they have purchased a cycle."[11]

49. The Defendant actually makes more money on selling the consumable cards to CoolSculpting providers than on selling the CoolSculpting devices. In 2018, it made $235.3 million on selling consumable cards and $126.3 million on selling the CoolSculpting devices and applicators.[12]

50. Incentivized by these profits from each CoolSculpting cycle, Defendant also closely controlled and continues to control the CoolSculpting providers' sales methods of the medical procedure. During training on the device, Defendant devotes a substantial part of the training time to boasting about the device's potential to substantially increase the providers' revenues and how to increase CoolSculpting sales by using various sales tactics. Defendant's training materials include sample scripts to use on prospective CoolSculpting

---

[10] Zeltiq Aesthetics, Inc. (2015). *Annual 10-K Report.* Page 6/153. Retrieved from https://www.sec.gov/Archives/edgar/data/1415336/000162828016012690/zltq-12312015x10k.htm.

[11] *Id.*

[12]  Allergan Reports Fourth Quarter and Full-Year 2018 Financial Results. Retrieved from https://allergan.gcs-web.com/news-releases/news-release-details/allergan-reports-fourth-quarter-and-full-year-2018-financial

patients and describe upselling methods such as having the patients return for a "follow-up appointment" where the provider has an opportunity to sell additional cycles or by pre-selling CoolSculpting packages where the patient pays for multiple cycles in advance for future uses.[13]

51. Defendant collects data from its medical devices, completely bypassing the CoolSculpting providers. To help with promoting sales of the procedure, Defendant installed a cellular device inside each CoolSculpting machine that automatically reports information about each cycle administered by the CoolSculpting providers *directly* to the Defendant.

52. This platform, which is called CoolConnect, is used by the Defendant to obtain data from the CoolSculpting devices and use it to pressure CoolSculpting providers to sell more procedures. According to Keith Sullivan, the Zeltiq Aesthetics, Inc.'s former CEO (2012 - April 2017), in an interview he gave to PRIME Journal, "In this way we know what we are doing and we can show [the CoolSculpting providers] how they are doing such as if you're only treating flanks, why aren't you looking at their belly, and so on. The PDM[14] has the data to bring back to those accounts on a monthly or quarterly basis and follow their progress."[15]

53. Likewise, at all times material, Defendant controlled how the CoolSculpting providers advertised their CoolSculpting services. Defendant established a minimum advertised price policy, restricting providers from independently setting and advertising prices for the

---

[13] Guidelines for CoolSculpting Success. Retrieved from
  https://docplayer.net/docview/26/9289425/#file=/storage/26/9289425/9289425.pdf.
[14] Practice Development Manager, also known as CoolSculpting's sales representatives.
[15] Lewis, Wendy. "Fat Chance Building a Better Body the Cool Way." *Prime Journal.* May/June 2016: 16-20. Retrieved from
  https://www.prime-journal.com/fat-chance-building-a-better-body-the-cool-way/

CoolSculpting procedure and penalized providers that advertised a lower price for their CoolSculpting services.[16]

54. Defendant also gave money or other valuable consideration to CoolSculpting providers for marketing CoolSculpting services on billboards, print ads, local TV, radio, and other media outlets.

55. The CoolSculpting website lists local providers, links directly to their websites and gives prospective patients an option to request a CoolSculpting appointment directly with the providers.

56. Defendant also furnished CoolSculpting providers with advertisement materials directed at CoolSculpting patients which describe the benefits of the procedure, such as brochures and posters.

57.  Defendant also provided documents and forms to CoolSculpting providers to use in their practice when administering the CoolSculpting procedure to patients.

58. The documents, brochures, posters, and forms provided by Defendant to CoolSculpting providers depict the CoolSculpting logo and clearly promote the Defendant's medical device.

59. Therefore, after a consumer sees a CoolSculpting advertisement, he or she is directed to visit www.coolsculpting.com, which refers the consumer to a local CoolSculpting provider. When a consumer arrives at a CoolSculpting provider's office, he or she sees CoolSculpting posters and brochures which describe the benefits of the CoolSculpting procedure. The provider sells the procedure to the consumer using specific sales techniques

---

[16] Lewis, Wendy. "Fat Chance Building a Better Body the Cool Way." *Prime Journal.* May/June 2016: 16-20. Retrieved from
https://www.prime-journal.com/fat-chance-building-a-better-body-the-cool-way/

according to the training that the Defendant provided.  The provider uses special forms depicting the CoolSculpting trademark logo in administering the procedure. And, the provider pays Defendant a portion of the cycle price charged to the consumer for the CoolSculpting procedure.

60. Ultimately, through a uniquely designed system which Defendant controls, the Defendant used CoolSculpting providers to sell CoolSculpting procedure on its behalf.

### THE PROBLEM WITH COOLSCULPTING

61. Although the idea of eliminating fat cells by using cooling technology makes sense in theory, in practice, it is nothing more than an illusion.

62. The CoolSculpting device can only *attempt* to kill fat cells by traumatizing them with the application of cold temperature in the hopes of a later death.

63. The problem with the CoolSculpting device is twofold. First, the CoolSculpting device cannot ensure that *any* of the fat cells it targets will actually die. Second, even if *some* fat cells die, the effect is minimal and temporary.

64. On September 23, 2016, the National Advertising Division found that the typical fat layer reduction from CoolSculpting is *one millimeter* (1mm) and cautioned the manufacturer to "avoid making fat elimination claims.[17]

65. Moreover, even when the CoolSculpting device does actually kill some targeted fat cells, the unwanted fat bulges easily return because the device does not eliminate all fat cells in the targeted area. The void is quickly filled by the expansion of surviving fat cells, resulting in a reversal of the effect.

---

[17] *Zeltiq Aesthetics, Inc. - CoolSculpting® Cryolipolysis® Body Contouring System.* National Advertising Division. NAD Case Report No. September 23, 2016. Back Refence: ¶3020.

66. Therefore, although a CoolSculpting patient may initially see a reduction of fat in the treated area, the stubborn fat bulge will inevitably return if the patient does not adhere to a very strict diet.

67. But, when the CoolSculpting device *does not* kill the fat cells it targets during the procedure, and the cells survive the *cryo-assault* of CoolSculpting, the tissue goes into cellular adaptation mode.

68. Cellular adaptation is a process in which a traumatized cell tries to adapt to an adverse environment by acting abnormally. Cellular adaptation can present itself in various ways including, *hyperplasia* – a process in which a cell multiplies thereby increasing the size of the affected tissue, and *hypertroph*y – a process in which a cell enlarges caused by an increase in organelles, and structural proteins, also resulting in an increase in the size of the affected tissue.

69. Paradoxical Adipose Hyperplasia (PAH), sometimes described as Paradoxical Adipose Hypertrophy, an adverse effect of CoolSculpting, is an example of cellular adaptation.

### PARADOXICAL ADIPOSE HYPERPLASIA "PAH"

70. At some point in 2011, Defendant became aware that its CoolSculpting System device had the ability to cause patients to develop a condition that results in the *opposite effect* of the device's advertised purpose – a *permanent increase in the size of the treated fat bulges.*

71. Paradoxical Adipose Hyperplasia, also known as "PAH" and sometimes referred to as Paradoxical Hyperplasia or "PH," is a permanent condition that is developed *only* as the result of undergoing Cryolipolysis® via the CoolSculpting device. PAH is not known to occur naturally or from any other medical procedure or device.

72. Thus, with the invention of the CoolSculpting System device and the process of Cryolipolysis®, a new adverse medical condition was created called Paradoxical Adipose Hyperplasia.

73. PAH causes *permanent* detrimental change to the microstructure of the tissue in the CoolSculpting treatment area, affecting various types of cells including adipocytes, vascular cells, blood cells, macrophages, endothelial cells, stem cells, and interstitial cells.[18] The tissue affected by PAH becomes fibrous and different from regular, untreated tissue resulting in enlarged and sometimes hardened tissue masses that are disfiguring to the body.

74. PAH is not a simply an enlargement of fat in the treatment area, it is a disease of the tissue that results in a *deformation* of the body.

75. Unlike regular fat tissue, PAH does not resolve on its own. Once a person develops PAH after CoolSculpting, the affected tissue does not react the same as regular fat to weight loss. No matter how much weight a person loses after developing PAH, the area affected by PAH will never get smaller. The deforming effect of PAH remains *permanently* and can only be removed surgically.

76. The visual effect of PAH varies from person to person, and may present differently in a single person, depending on the area of the body affected.

---

[18] Seaman, SA; Tannan, SC; Cao, Y; Peirce, SM; Gampper, TJ. Paradoxical Adipose Hyperplasia and Cellular Effects After Cryolipolysis: A Case Report. *Aesthetic Surgery Journal.* 2015 Nov; Vol. 36(1): NP6-NP13. DOI:10.1093/asj/sjv105; and
Stroumza, Nathaniel MD; Gauthier, Nelly MD; Senet, Patricia MD; Moguelet, Philippe MD; Nail Barthlemy, Raphael MD; Atlan, Michael MD. Paradoxical Adipose Hypertrophy (PAH) After Cryolipolysis. *Aesthetic Surgery Journal.* 2018; Vol 38(4): 411-417, 415. DOI: 10.1093/asj/sjx159.

77. PAH has a wide range of effects on a person's body. In more fulminant cases, it can present itself as an obvious hardened protruding mass (Figure A), a soft enlargement of tissue (Figure D), sagging folds (Figure B), or as a bulge of tissue in the shape of the CoolSculpting applicator (Figure C).

78. The following illustrations show examples of PAH, that are more visually apparent:



**Figure A**

BEFORE: abdominal area before CoolSculpting procedure

AFTER: abdominal area affected by PAH after CoolSculpting procedure

**Figure B**

BEFORE: upper (bra area) and lower flanks before CoolSculpting procedure

AFTER: upper (bra area) and lower flanks affected by PAH after CoolSculpting procedure

**Figure C**

BEFORE: upper flanks (under arm area) before CoolSculpting procedure

AFTER: upper flanks (under arm area) affected by PAH after CoolSculpting procedure

**Figure D**

BEFORE: lower flanks, lower abdomen and inner thighs before CoolSculpting procedure

AFTER: lower flanks, lower abdomen and inner thighs affected by PAH after CoolSculpting procedure

79. In addition to the obvious, well demarcated cases, PAH can also present itself as unchanged or worsening of "girth" following CoolSculpting, characterized as a mild to moderate effect of PAH, wherein the tissue damage is more difficult to identify visually.

80. The most accurate method of diagnosing PAH is through a wedge biopsy of the affected tissue because only a microscopic evaluation can definitively determine whether the tissue sustained damage from CoolSculpting. Although fulminant cases of PAH can be diagnosed by palpitation and visual comparison of pre-treatment photographs, milder cases of PAH

where the masses are not as obvious, cannot be identified without more invasive diagnostics.

81. A single person undergoing CoolSculpting in several places on their body may, and *usually does* develop PAH in *each treatment area*. (See Figure D).

82. In some cases of PAH, the subcutaneous tissue is also affected, causing the skin to lose firmness, resulting in laxity or sagging of the skin in the area of treatment. (See Figure B).

83. Correcting PAH requires various surgeries. The specific type and number of surgeries depend on multiple factors such as: the extent of tissue damage, the particular area of the body affected, and the outcome of the initial surgery to remove affected tissue.

84. The types of reconstructive surgeries and procedures necessary to remove PAH include, but are not limited to: power assisted liposuction, liposculpture, excision, abdominoplasty, laser treatment to remove surgery scars.

85. Because PAH changes the character of the subcutaneous tissue, removing the fat tissue with liposuction is a more difficult process. The affected tissue becomes lumpy, fibrous, and scar-like, which requires the surgeon to use more invasive and aggressive methods of removing the PAH tissue, resulting in longer recovery time and unpredictable results.

86. Even with surgeries, a full reconstruction of the affected area is not guaranteed, and the long-term consequences of developing PAH are still unknown.

87. A person with PAH is at risk for future health problems, including the return of the deformity years after surgery.

88. A person suffering from PAH either has to live with it forever or try to remove it through plastic surgery. Surgical interventions to alleviate the condition require general anesthesia and involve aesthetic and health risks, including death.

89. Males are at a higher risk of developing PAH.

90. PAH is spontaneous and unpredictable, occurring unexpectedly without any specific triggering event. At this time, the only known prevention of Paradoxical Adipose Hyperplasia is abstinence from CoolSculpting.

91. Because PAH is solely attributed to the CoolSculpting medical device, the medical community is not independently familiar with the condition.

### DEFENDANT'S SUPERIOR KNOWLEDGE ABOUT PAH

92. Soon after the CoolSculpting device went on the market, Defendant received multiple reports of patients developing "firm bulges" and fat tissue "increases" in the treatment area after undergoing Cryolipolysis® with the CoolSculpting device.

93. As CoolSculpting became more popular, a multitude of reports began pouring into the manufacturer of people experiencing the *opposite effect* in the area they had treated with CoolSculpting. The reports noted that the condition could only be alleviated through *invasive plastic surgery*.

94. The Defendant named the condition "Paradoxical Hyperplasia" or "PH" and still uses this term to describe the condition.

95. In medical literature, the condition is referred to as "Paradoxical Adipose Hyperplasia" or "PAH," a term which Defendant does not use.

96. Since the CoolSculpting device went on the market in 2011, Defendant was privy to extensive information regarding persons who developed PAH. CoolSculpting providers and CoolSculpting patients reported cases of PAH to the manufacturer and submitted medical records, photographs, quotes for surgeries, diagnosis information, and other related documentation to the Defendant.

97. Defendant collected important information about PAH patients in order to "investigate" PAH claims.

98. At some point, Defendant designed a "program" for persons that had developed PAH. The Defendant offered to cover the cost of a *sing*le liposuction surgery in exchange for a release of liability for any future damages associated with PAH.

99. Sometimes, in lieu of payment for liposuction, Defendant would offer a refund for some cycles, also in exchange for a release of liability for any future damages associated with PAH.

100. Through this program, Defendant had direct communications with CoolSculpting providers and CoolSculpting patients that developed PAH, which allowed Defendant to collect information not available to anyone else.

101. Defendant required that CoolSculpting patients return to their CoolSculpting provider and request an evaluation of their condition.

102. Defendant instructed CoolSculpting providers to follow a very narrow protocol for diagnosing patients with PAH, which resulted in many patients not being diagnosed with PAH despite suffering tissue damage from CoolSculpting.  Defendant's diagnosis protocol only recognized fulminant cases with well demarcated masses as PAH and relied on the physicians' hand palpation of the affected tissue and a visual review of photographs taken of the patient before the procedure. The CoolSculpting providers were never instructed to take measurements of the patients *before* the CoolSculpting procedure to have an objective means of determining whether he or she attained a reduction in tissue or increased girth (indicating PAH).

103. *If* the CoolSculpting provider agreed to cooperate, many did not for the fear of liability, Defendant collected the patients' medical records, photographs of the affected area, and diagnosis notes from the providers.

104. After receiving this information about each patient, Defendant re-evaluated the cases remotely through its internal "Medical Safety Team." Defendant reviewed the patients' photographs and short descriptions of the condition and followed a very narrow protocol for diagnosing PAH. As a result of this re-evaluation process, Defendant selectively approved PAH claims for some but not all of the affected areas, sometimes completely denying the presence of PAH.

105. This practice is exemplified in a letter that Defendant sent to Dobbins's CoolSculpting provider:

> Hello Amber,
>
> Thank you for your patience and assistance with this case.
>
> **I have received feedback from the medical safety team that this case was deemed consistent with PH to the Flanks.**
>
> The Claim has been denied to the patients lower abdomen. Upon the medical teams review of the before and after photos they stated there is no clear enlargment or demarcation notible to the lower abdomen. They did state there was Skin Laxity, which I have noted to the case.
>
> I have submitted this case to claims for the Flanks.

106. Yet, through this program and extensive communications with PAH patients and their providers, Defendant came to know that liposuction was not always the appropriate treatment for PAH and that even surgery does not always resolve PAH.

107. Although the Defendant knew that PAH requires more than one surgery and that in some cases liposuction is not an appropriate means of removing the affected tissue, Defendant only offered to cover the cost of one liposuction surgery in exchange for a release of liability for any future damages associated with PAH.

108. In some cases, Defendant referred PAH patients directly to plastic surgeons and paid for a single liposuction surgery, also in exchange for a release.

109. Defendant did not cover the cost of travel for surgery, any other surgeries required to remove PAH, lost wages during recovery, or any other damages directly resulting from the injury caused by the CoolSculpting device.

110. If the CoolSculpting providers did not agree to cooperate with the CoolSculpting patients in diagnosing PAH, the patients were left on their own. In many cases, patients sought out an evaluation from providers that did not have any experience with the CoolSculpting device and did not have any knowledge about PAH and therefore could not be effective in diagnosing and treating the condition.

111. Through the adverse event reports and its liposuction program, Defendant was a centralized hub of information about PAH.

112. Likewise, Defendant performed its own studies on PAH to determine the cause of the condition.  Defendant never release the findings of its studies to CoolSculpting providers.

113. Based on numerous reports that it received, Defendant knew that the incidence rate of PAH was not rare.

114. Likewise, it knew that people with PAH must undergo multiple invasive surgeries to remove it, which were *not* limited to one liposuction.

115. Defendant also knew that persons afflicted with PAH were emotionally distraught to find out that the only way to remove PAH is through invasive surgeries because the draw of the CoolSculpting procedure was to *avoid* invasive surgery.

116. Defendant knew that the surgeries required to remove PAH involved long recoveries, pain, health risks, and financial expenditures. Defendant also knew that some people may not want to undergo invasive surgeries after developing PAH because they are not willing to subject themselves to the risks, pain, inconvenience of recovery, or financial burdens of undergoing the reconstructive procedures, leaving them with the deformity for life.

117. Defendant kept a record of the reported incidents of PAH which included important data such as place of treatment, date of treatment, area(s) of the body affected, date PAH was diagnosed, etc. The data gave Defendant information regarding the incidence rate of the condition.

118. By being in possession of information obtained from persons who developed PAH, Defendant had superior knowledge about the extent, severity, and frequency of the condition, better than any other person in the world.

### DEFENDANT'S STRATEGIC CONTROL OVER PUBLIC INFORMATION ABOUT PAH

#### The Secret "White Paper"

119. In 2012, soon after Defendant discovered that its device has the ability to seriously harm users by causing them to develop PAH after CoolSculpting, the manufacturer commissioned the inventor of the Cryolipolysis® process, Dr. R. Rox Anderson and his colleague at Massachusetts General Hospital, Dr. Mathew Avram, to author a document about the serious and permanent adverse effect, to which Defendant referred to as "the White Paper."

120. The White Paper described the condition as follows: "Recently, the manufacturer received eleven separately confirmed reports of patients who developed growth of soft tissue in the treated site(s) over several months following treatment. The soft tissue growth is painless, firm, and visibly enlarged within the treated areas. The enlargement typically started two to three months post treatment, often after the expected reduction in fat, becoming visibly evident at four to five months post treatments. Because the soft tissue enlargement is a rare, unexpected growth of subcutaneous fat tissue, this phenomenon is being termed "paradoxical hyperplasia."[19]

121. The White Paper also described very strict criteria for diagnosing PAH, admitted that the side effect is "significant," but also emphasized the rarity of the condition.

122. The White Paper also warned, "Patients who are considering undergoing this procedure should be counseled on the possibility of its occurrence, as well as the surgical options available should it occur."[20]

123. The Defendant kept the White Paper a *secret* from CoolSculpting providers and *did not* disclose the document unless a provider insisted on obtaining additional information about PAH, and only *after* the provider had a patient develop the condition.

124. In some cases, Defendant even required the CoolSculpting providers to sign a *confidentiality agreement* before it disclosed the White Paper to them.

125. When Defendant did share the White Paper with a select few providers, under specific circumstances, it always used the November 30, 2012 version of the document, which was

---

[19] https://skinrenu.com.au/wp-content/uploads/2017/03/13.PH-white-paper-FINAL.pdf
[20] *Id at* p. 4.

never updated with the most current information about PAH and which acknowledged only *eleven* known cases of PAH.

126. The White Paper, although more informative than the device's User Manual and Defendant's training presentations, was still inadequate. It was outdated and did not present the true danger of the CoolSculpting device.

### Defendant's use of consultant's scholarly articles about PAH

127. Although Defendant knew that PAH was a significant and serious adverse effect of its CoolSculpting device since at least 2011 and had Drs. Anderson and Avram draft the *secret* White Paper detailing the newly discovered condition in 2012, it was not until March 2014 that the medical community received any information about the serious and permanent adverse effect.

128. In March 2014, Dr. Anderson, his colleague Dr. Avram, and several other researchers published a scholarly article called "Paradoxical Adipose Hyperplasia After Cryolipolysis" in JAMA Dermatology, announcing that "[v]ery rarely, a delayed increase in adipose tissue at the treatment site can occur, which to our knowledge has not yet been reported in the medical literature. We suggest the term "paradoxical adipose hyperplasia" (PAH) for this phenomenon."[21]

129. The majority of the authors, including the inventor of the Cryolipolysis process, Dr. Anderson, who was serving on Zeltiq's Medical Advisory Board, reported a financial conflict of interest connected to the manufacturer of CoolSculpting.

---

[21] Jalian, H. Ray MD; Avram, Mathew M. MD, JD; Garibyan, Lilit MD, PhD; Mihm, Martin C. MD; Anderson, R. Rox MD. Paradoxical Adipose Hyperplasia After Cryolipolysis®. *JAMA Dermatology.* 2014 Mar; Vol. 150(3): 317-319. DOI: 10.1001/jamadermatol.2013.8071.

130. The authors suggested to name the never-before-reported adverse effect of CoolSculpting as "Paradoxical Adipose Hyperplasia" (PAH).[22]

131. The JAMA article described one case of a man in his 40s who underwent the Cryolipolysis® procedure with the CoolSculpting medical device and initially noticed a reduction in fat tissue, but three months after CoolSculpting, his fat grew into a noticeable mass even though he did not gain any weight. He elected not to undergo invasive surgery to remove the deformity.

132. The following photograph was provided:



Figure 1. Paradoxical Adipose Hyperplasia Approximately 5 Months Following Cryolipolysis

There is a sharply demarcated, rectangular enlargement around the umbilicus corresponding to the treatment zone. This soft-tissue protrusion was soft, mobile, and slightly tender to palpation. The overlying skin was unremarkable.

133. The photograph chosen for the article depicted just one possible presentation of PAH on a person's body, out of a wide range of deformities the condition can cause, misleading the reader into believing that tissue affected by PAH is always so patently obvious.

---

[22] The term "Paradoxical Adipose Hyperplasia" (PAH) differs slightly from how the same authors called the condition in the secret White Paper in 2012 and how the Defendant continues to call the condition today – "Paradoxical Hyperplasia" (PH).

134. The article also mentioned a woman in her 50s that had developed PAH nine months after CoolSculpting and needed abdominoplasty to remove the deformity.[23] A photograph of her PAH affected area was not provided in the article.

135. Throughout the three-page article, the word "rare" was mentioned seven times; three times in the abstract.

136. The article focused on Cryolipolysis and did not mention the device's name "CoolSculpting," vaguely referring to Zelitq Aesthetics, Inc. as the device used to administer the procedure.

137. The article "estimated" that the incidence of PAH is about "0.0051%, or about 1 in 20,000 treated patients." It noted that "[t]o date, 33 confirmed cases of paradoxical hyperplasia have been reported to the device manufacturer as part of post marketing surveillance data."[24]

138. By the time the article was published, Defendant was aware of *many more* cases of PAH than 33.

139. Defendant, itself, never directly notified CoolSculpting providers about its post-market discovery of PAH or what it knew about the deforming condition through the adverse event reports that it had received since 2011.

140. Instead, Defendant strategically used the 2014 JAMA article in its training materials and referred to the article when CoolSculpting providers asked questions about PAH, even though the Defendant knew that the information in the article was misleading in regard to

---

[23] Jalian, H. Ray MD; Avram, Mathew M. MD, JD; Garibyan, Lilit MD, PhD; Mihm, Martin C. MD; Anderson, R. Rox MD. Paradoxical Adipose Hyperplasia After Cryolipolysis®. *JAMA Dermatology.* 2014 Mar; Vol. 150(3): 317-319. DOI: 10.1001/jamadermatol.2013.8071.
[24] *Id.*

the number of PAH reports that it has received, the incidence rate of PAH, the range of presentation of PAH on the human body, the extent of tissue damage, etc.

141. Likewise, since the 2014 JAMA article, Defendant continued to receive a multitude of reports of people suffering from PAH after CoolSculpting. The Defendant's previously estimated incidence rate grew exponentially every year.

142. Defendant, despite knowing that it had seriously underestimated the frequency of PAH, *still* did not notify the CoolSculpting providers about the substantial increase in the incidence rate.

143. When CoolSculpting providers individually asked the manufacturer about the current incidence rate of PAH, Defendant gave inaccurate statistics, directed the providers to Dr. Anderson's outdated 2014 JAMA article, or simply pointed to the User Manual for information about the device's adverse effects.

144. From 2012 until the present, Defendant *never* updated the CoolSculpting System User Manual to reflect updated information about PAH.

145. Defendant manipulating the calculation of the incidence rate and stated inaccurate incidence rate statistics to CoolSculpting providers.

146. Defendant also instructed its employees to use the words "rare" when referring to PAH in their communications with CoolSculpting providers, the public, and the FDA.

147. To support the statements that the likelihood of developing PAH was "rare" Defendant used paid consultants to disseminate *inaccurate* information regarding the incidence rate of PAH under the guise of scientific publications. The articles emphasized the rarity of the condition and presented false data to support this claim. The paid consultants' articles cited to other publications written by Defendant's paid consultants. Defendant would then cite

to these articles when answering questions about PAH to CoolSculpting providers and in its training materials to support its statements that PAH was rare and unlikely to occur.

148. For example, in the March 2014 JAMA publication authored by the inventor of Cryolipolysis and a number of his colleagues with financial conflicts of interest they stated, "We estimate that the incidence rate of PAH is about 0.0051%, or about 1 in 20 000 treated patients."[25]

149. Contrary to this statistic, an unbiased author reported the incidence rate of PAH for the same time period was 0.010%, twice higher than the statistic reported by Defendant's consultants."[26]

150. A manufacturer-sponsored article published in 2015 in the Aesthetic Surgery Journal, stated that no serious adverse effects were observed at 16-weeks post treatment, and did not even mention the possibility of PAH when boasting about the wonders of CoolSculpting. The study was paid for by the manufacturer, who also provided ultrasound and photography support, both of which were used to prove the effectiveness of the medical device. [27]

151. Then, in March 2016 a group of unbiased authors addressed the incidence rate of PAH as reported in the March 2014 article written by Defendant's consultants, stating, "Our reported incidence is 0.78 percent [1 in 129], more than 100 times higher than the device

---

[25] Jalian, H. Ray MD; Avram, Mathew M. MD, JD; Garibyan, Lilit MD, PhD; Mihm, Martin C. MD; Anderson, R. Rox MD. Paradoxical Adipose Hyperplasia After Cryolipolysis®. *JAMA Dermatology.* 2014 Mar; Vol. 150(3): 317-319. DOI: 10.1001/jamadermatol.2013.8071.

[26] Stefani, William A. MD, FACS. Adipose Hypertrophy Following Cryolipolysis®. *Aesthetic Surgery Journal.* 2015, Vol. 35(7): NP218-NP220, at NP219. DOI: 10.1093/asj/sjv069.

[27] Stevens, W. Grant; Bachelor, Eric P. Cryolipolysis Conformable-Surface Applicator for Nonsurgical Fat Reduction in Lateral Thighs. *Aethetic Surgery Journal.* 2015 Jan; Vol 35: 66-71. DOI: 10.1093/asj/sju024.

manufacturer reported incidence of 0.0051 percent. Ours is not a unique experience, as a dermatology practice in Houston, Texas, recently reported a paradoxical adipose hyperplasia incidence of 0.47 percent [1 in 213]. Although our treatment numbers are low when considering the popularity of the procedure, *we believe that paradoxical adipose hyperplasia is underreported*."[28] (emphases added).

152. To which, a paid consultant for Defendant wrote a response stating that, "The manufacturer reports that since the first quarter of 2014, the paradoxical adipose hyperplasia incidence rate has fluctuated between 0.021 and 0.026 percent, or approximately one in 4000 treatment cycles."[29]

153. While an independent study published on November 14, 2017, found that although the manufacturer has reported 33 cases of PAH worldwide, estimating the incidence rate of 0.021%, the rate is "probably underestimated." The authors of the study, who were not associated with the manufacturer, found that the incidence rate of PAH in their series was 1% (4 out of 398 patients developed PAH). They noted that "many of the more than 2 million patients treated with cryolipolysis worldwide are affected by PAH." [30]

154. In response to this independent study, a solo practitioner plastic surgeon wrote that he too has seen two "fulminant PAH" cases out of 150 patients, and "10 other patients had what

---

[28] Kelly, Emma B.A.; Rodriguez-Feliz, Jose M.D.; Kelly, Michael E. Paradoxical Adipose Hyperplasia after Cryolipolysis®: A Report on Incidence and Common Factors Identified in 510 Patients. *Plastic and Reconstructive Surgery.* 2016 Mar; Vol. 137: 639e-640e. DOI: 10.1097/01.prs.0000480023.35573.b7.

[29] Sasaki, Gordon H. Reply: Cryolipolysis for Fat Reduction and Body Contouring: Safety and Efficacy of Current Treatment Paradigms. *Plastic and Reconstructive Surgery.* 2016 Mar; Vol. 137: 640e-641e. DOI: 10.1097/PRS.0000479983.49996.c0.

[30] Stroumza, Nathaniel MD; Gauthier, Nelly MD; Senet, Patricia MD; Moguelet, Philippe MD; Nail Barthlemy, Raphael MD; Atlan, Michael MD. Paradoxical Adipose Hypertrophy (PAH) After Cryolipolysis. *Aesthetic Surgery Journal.* 2018; Vol 38(4): 411-417, 414. DOI: 10.1093/asj/sjx159.

we considered unchanged or even worsened "girth," which in retrospect may represent a new classification of PAH considered to be mild to moderate."[31]

155. Although the Defendant never disclosed the information it possessed about PAH to CoolSculpting providers, it used the scholarly articles written by its paid consultants, which contained inaccurate information about PAH and were skewed in favor of the Defendant, to refer CoolSculpting providers for "additional" information regarding PAH.

**DEFENDANT DOWNPLAYED THE SERIOUSNESS OF PAH TO THE FDA**

156. Defendant also downplayed the seriousness, permanency, and frequency of PAH to the FDA.

157. For example, on March 14, 2016, Defendant submitted a 510(k) Summary of Safety and Effectiveness report to the FDA, citing to "literature review" for evidence of adverse events caused by CoolSculpting and reporting that there have been only "6 cases" of "serious adverse events" which include Paradoxical Adipose Hyperplasia. By 2016, Defendant was aware of *thousands* of PAH reports.

158. Likewise, Defendant failed to report all known incidents of PAH to the FDA.

159. PAH was a reportable adverse event under 21 CFR 803 due to the permanency and severity of the condition, and because surgical intervention is the only means of resolving the permanently disfiguring condition.

---

[31] Vogel, James E MD. Comments on 'Paradoxical Adipose Hypertrophy (PAH) After Cryolipolysis. *Aesthetic Surgery Journal.* 2018; Vol 38(9): NP135-NP137. DOI: 10.1093/asj/sjy129.

160. Since the CoolSculpting device went on the market, Defendant has received *thousands* of reports of PAH through September 2019. Defendant reported *less than* 70 to the FDA's public databased MAUDE (Manufacturer and User Facility Device Experience).

### INADEQUATE "WARNINGS" ABOUT PAH

### *Labeling*

161. Although Defendant provided *some* information regarding PAH to CoolSculpting providers, it was misleading and written in such a way as to give the providers the impression that the condition causes a less serious effect and is not likely to occur.

162. Defendant creatively chose words that were ambiguous and did not provide enough specificity on the details that were necessary for a CoolSculpting provider to understand the condition.

163. Defendant used the following language to describe the disfiguring condition of PAH in the User Manuals for the CoolSculpting device, dedicating only two lines to inform the provider about the permanent condition, stating:

### Rare Side Effects

• Paradoxical hyperplasia: Visibly enlarged tissue volume within the treatment area, which may develop two to five months after treatment. Surgical intervention may be required.

164. Defendant used similarly vague language to describe PAH to CoolSculpting providers in its slide-show presentations which it used during its online and live training on how to operate the device.

165. Defendant's "warnings" about PAH to CoolSculpting providers were *inaccurate* in content and *ambiguous* in the manner of expression. The language used by Defendant did not relay the seriousness, permanency, and frequency of the condition.

166. Defendant's inadequate disclosure about PAH *failed* to inform the CoolSculpting providers:

    a.   That PAH is the opposite effect of CoolSculpting's advertised purpose;

    b.   That PAH is a disease of the tissue;

    c.   That PAH results in a physical deformity;

    d.   That a single patient can suffer multiple deformities on the body from PAH;

    e.   That the deformity will never resolve on its own because it is permanent;

    f.   That PAH changes the microstructure of the tissue;

    g.   That invasive surgeries are required to remedy the affected tissue;

    h.   That surgery may not resolve PAH affected tissue;

    i.   That the CoolSculpting device can cause cutaneous tissue laxity requiring surgery to cut, lift, and sew the skin;

    j.   That PAH has a wide range of physical effects on the body;

    k.   That the frequency of occurrence of PAH is not rare and that thousands of people have suffered from the condition after undergoing CoolSculpting;

    l.   That the future impact on a person's health after developing PAH is unknown, and there is a possibility that future medical treatment will be required to treat the condition.

167. Defendant also made false statements to CoolSculpting providers that the device's smaller sized applicators used to administer the cycles eliminated or significantly reduced the occurrence of PAH.

*Training by Defendant's Representatives*

168. Defendant used non-medical sales people called Practice Development Managers ("PDMs") to provide training to Plaintiffs' CoolSculpting providers and to inform the providers about PAH.

169. Defendant's PDMs were the primary points of contact for CoolSculpting providers to obtain and relay any information regarding the CoolSculpting device. The PDMs provided training on operating the CoolSculpting device, provided information about the device's side effects, gave marketing advice, relayed information from providers to Defendant, and sold consumable cards to the CoolSculpting providers.

170. The PDMs' primary role was to sell Defendant's products to the providers. After the providers purchased the CoolSculpting device, the PDMs' role was to ensure that the providers continued to purchase the consumable cards which are required to operate the CoolSculpting device.

171. Thus, the same persons that were tasked with providing adverse effect information to CoolSculpting providers were also tasked with selling Defendant's products to them.

172. The training provided by Defendant to CoolSculpting providers on the CoolSculpting device consisted mainly of training on sales tactics and emphasized the device's ability to increase revenues for the providers' medical offices.

173. During training, Defendant's PDMs made verbal statements to CoolSculpting providers that the likelihood of CoolSculpting patients developing PAH is very low and that the provider will probably not see a case of PAH in their practice.

174. The PDMs gave false statistics about the incidence rate of PAH to the CoolSculpting providers.

175. Defendant's PDMs did not inform CoolSculpting providers on the true incidence rate of PAH and made statements that minimized the risk of developing the condition.

176. Defendant's PDMs downplayed the seriousness and permanency of the condition to the CoolSculpting providers in order to incentivize the providers to purchase the CoolSculpting devices and sell more cycles to their patients.

### DEFENDANT'S MISREPRESENTATIONS ABOUT PAH TO COOLSCULPTING PROVIDERS

177. Defendant knew that CoolSculpting providers were not independently familiar with PAH and that they relied on Defendant for information about the condition solely associated with the CoolSculpting device.

178. Despite Defendant's extensive knowledge about PAH, the information the manufacturer released to CoolSculpting providers was *de minimis* and *deceptive*.

179. Defendant did not provide information regarding PAH to CoolSculpting providers *prior* to the purchase of the medical device.

180. After the devices were purchased from Defendant, Defendant downplayed the severity, permanency, and frequency of PAH to CoolSculpting providers.

181. Defendant withheld important information about PAH from CoolSculpting providers and did not inform the providers about the details of the condition or how to diagnose PAH until *after* a patient developed PAH.

182. Defendant's policy in regard to PAH was to provide very little information about PAH and wait until a patient develops the condition. Once a CoolSculpting provider notified the Defendant about a potential PAH case, Defendant would release additional information to the CoolSculpting providers about the condition and how to diagnose it.

183. This practice is exemplified in a letter that Defendant sent to Plaintiff Chubchai:

After contacting your treatment provider to collect your treatment information, we will provide them with the information needed to assess you for Paradoxical hyperplasia, and make sure they are aware of the rare possible side effect.

Your case number for reference- # PR 2098532

Thank you!

**Danielle McDonald**
Coolsculpting  Product Surveillance Rep IV
Allergan PLC 000
(888) 935-8471  Coolsculpting Office
(925) 396 6079   Fax

www.coolsculpting.com

 coolsculpting

184. Defendant also advised CoolSculpting providers not to mention "Paradoxical Adipose Hyperplasia" or "PAH" to patients who requested an evaluation for the condition until the Defendant's claims department had an opportunity to review the patients' medical records and diagnosis of the CoolSculpting providers and "confirm" the diagnosis.

185. Defendant implemented a practice of rejecting CoolSculpting patients' diagnoses of PAH and refused to confirm cases of PAH to all parts of the body affected. For example, in Plaintiff Brooks's case, although she was diagnosed with PAH to her entire abdomen by multiple physicians, Defendant refused to confirm PAH to her upper abdomen.

Date: December 30, 2019 at 1:40 PM
Subject: Allergan CoolSculpting - Clinical Case PR 2034503

Hi Paula,

I am sorry I did not get you sooner, I was gone due to the holiday and I am catching up on emails.

The case was reviewed and the Medical Safety Assessment reviewer deemed your mid and lower abdomen consistent with paradoxical adipose hyperplasia (PH). The reviewer was unable to deem the upper abdomen consistent with PH. I will have to send the case for supplemental medical assessment for review of your upper abdomen.

186. Likewise, in Plaintiff Dobbins's case, although her provider diagnosed her with PAH on each of her flanks and on her abdomen, Defendant "confirmed" PAH only on her flanks, rejecting the diagnosis of her abdomen.[32]

187. Defendant's custom of selectively "confirming" cases of PAH without ever seeing the patient and rejecting medical providers' diagnoses was a systemic company-wide practice designed to minimize the number of PAH incidents reported to the manufacturer and to avoid liability.

188. By rejecting cases of PAH, Defendant lowered the incidence rate of its device's adverse effect.

**EFFECT OF DEFENDANT'S REPRESENTATIONS ON COOLSCULPTING PROVIDERS**

189. Defendant controlled the information that was available about PAH by using vague and inadequate language in the labeling materials, incentivizing PDMs to make false verbal statements about PAH to providers, paying consultants to write favorable scholarly publications, by concealing crucial information about PAH from CoolSculpting providers, and by downplaying the seriousness and frequency of the adverse event to the FDA.

190. Even if a CoolSculpting provider wanted to find out additional information regarding PAH, they would most likely find a manufacturer-friendly scholarly article on the subject or be pacified by the low number of PAH incidents reported on the FDA's public database MAUDE (Manufacturer and User Facility Device Experience.)

191. Although Defendant received thousands of reports of people developing permanent deformities from PAH after undergoing CoolSculpting, it never disclosed the number of people injured by its device to the CoolSculpting providers. Yet, Defendant repeatedly used

---

[32] *See supra* ¶106.

terms such as "rare" and "a small number of people" when referring to PAH and cited to its consultant's articles, to pacify the providers and mislead them into believing that PAH was not a likely risk of using the CoolSculpting device.

192. As the result of Defendant's misrepresentations, CoolSculpting providers did not understand the severity, permanency, and frequency of PAH.

193. CoolSculpting providers believed that the adverse effect is extremely rare and were under the impression that it was highly unlikely to ever see a CoolSculpting patient develop PAH.

194. Believing that PAH was not a real risk to CoolSculpting patients, CoolSculpting providers did not inform CoolSculpting patients about the possibility of suffering the opposite effect of the procedure's advertised purpose.

195. Due to Defendant's failure to adequately warn CoolSculpting providers about PAH, the providers did not have an accurate understanding of the condition and could not properly inform their patients about it.

196. Moreover, Defendant was aware that CoolSculpting providers did not understand PAH and were not properly informing their patients about the possibility of developing this serious condition after CoolSculpting because Defendant had numerous communications directly with persons who developed PAH and because of a multitude of public personal accounts online about how CoolSculpting patients were not being told about this serious adverse effect.

197. For example, even as late as January 2019, actual CoolSculpting providers cited a range of incorrect incidence rate statistics in their responses to prospective CoolSculpting patients on the popular review website www.RealSelf.com:

## 9 Answers

By Board Certified Doctors and Qualified Medical Professionals

### A: Paradoxical hyperplasia

Thank you for your question! Paradoxical hyperplasia is reported to be 0.00005% risk and more common in males. There is no way of knowing if one person is more at risk of developing it over another. But the good news is that is rare!  You sound like a good Coolsculpting candidate based on numbers but of course a consultation is the best determining factor.

As far as the person doing the treatments you need to ask how long they have been performing the treatments and how long they have been certified for. Look at THEIR before and after photos to see if you are happy with their results. It does not take a medical license to perform the treatments, so the technician or nurse might be more qualified and better trained. Every practice is different so feel free to treat the consultation as an interview to see if you feel comfortable with the provider.

show less ▲

**Kate Szal at:**
Aspira
★★★★★ (10)
*2 people found this helpful.*                                    Answered: 9 Jan 2019

HELPFUL

198.

### A: CoolSculpting

Dear cosmeticcurls,

Great question! The statistic for PAH is 0.0036%. PAH is less common with newer applicators.

- Dr. Edward Tangchitnob

199.



200.

201. On March 19, 2019, a plastic surgeon described his experience of trying to obtain information about the incidence rate of PAH from his CoolSculpting representative after he personally saw three PAH patients within a period of six months:

> I imagine that the incidence of this complication, paradoxical adipose hyperplasia, is exceedingly rare. When I asked one of the representatives from the company about its incidence, he reassured me that this condition occurs in one out of 70,000 cycles. As I have seen three patients in the past six months with this condition, I wonder if this is underreported or if the technology is that exceedingly popular. In any case, I believe it is in the best interest of my patients to understand what paradoxical adipose hyperplasia (PAH) is, what it means, and how it can be treated.

[33]

202. Contrary to the statistics believed by CoolSculpting providers, a recent study suggested that the incidence rate is closer to 1 in 100 or 1%.[34]

---

[33] https://zelkeninstitute.com/2019/03/19/paradoxical-adipose-hyperplasia/

[34] Stroumza, Nathaniel MD; Gauthier, Nelly MD; Senet, Patricia MD; Moguelet, Philippe MD; Nail Barthlemy, Raphael MD; Atlan, Michael MD. Paradoxical Adipose Hypertrophy (PAH) After Cryolipolysis. *Aesthetic Surgery Journal.* 2018; Vol 38(4): 411-417, 412. DOI: 10.1093/asj/sjx159; and
Vogel, James E. MD, FACS. Comments on "Paradoxical Adipose Hypertrophy (PAH) After Cryolipolysis." *Aesthetic Surgery Journal.* 2018; Vol 38(9): NP135-NP137, 135. DOI: 10.1093/asj/sjy129.

203. Adverse events with an incidence rate of 1% or higher are considered "common," not rare by the World Health Organization.[35]

204. The actual incidence rate of PAH after CoolSculpting may be closer to 10% when considering the number of CoolSculpting patients that developed mild to moderate tissue increases, which did not present as well-demarcated masses and remain undiagnosed.

## CLASS REPRESENTATIVES

205. Plaintiff, **Amber Elkins,** was interested in reducing stubborn fat on her flanks, abdomen, and inner and outer thighs. She began researching online for a non-invasive procedure that could help her do that. She found that a local medical spa provided CoolSculpting services, which promised to reduce fat via a non-invasive procedure.

206. In May 2016, Ms. Elkins visited Ideal Image located at 8956 Turkey Lake Rd #100, Orlando, FL 32819, to inquire about the CoolSculpting procedure.

207. At no point in time did anyone at Ideal Image tell Ms. Elkins, and she did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

208. On May 21, 2016, Ms. Elkins underwent two (4) cycles on her flanks.

209. She returned to the medical spa on July 16, 2016, for an additional two (8) cycles on her abdomen, inner, and outer thighs.

210. After the second session, Ms. Elkins did not see any results, and over time the areas of treatment became inexplicably larger.

---

[35] Wang, Erica MD; Kaur, Ramanjot MD; Jagdeo, Jared MD. Commentary on: Paradoxical Adipose Hypertrophy (PAH) After Cryolipolysis. *Aesthetic Surgery Journal.* 2018, Vol 38(4): 418-420, 419. DOI: 10.1093/asj/sjx167.

211. Because Ms. Elkins was never warned about the possibility of PAH or how it may present itself, she had no idea that the masses she developed on her body were the result of CoolSculpting.

212. After years of not understanding why the enlarged masses did not go away, despite various attempts at reducing them, Ms. Elkins spoke to a healthcare provider that suggested she return to her CoolSculpting provider and be examined for PAH. Ms. Elkins also performed her on internet research, entering specific key words that described her symptoms after CoolSculpting.

213. On March 4, 2020, Ms. Elkins returned to Ideal Image and met with her CoolSculpting provider who examined her. The nurse practitioner assessed Ms. Elkins and told her that she would make some phone calls and get back with her. The nurse practitioner did not diagnose Ms. Elkins with PAH.

214. On March 17, 2020, Ms. Elkins's CoolSculpting provider called her and explained that she had submitted her information to the Defendant for review and that Ms. Elkins will have to wait 90 to 120 days for any information about her condition.

215. On May 14, 2020, Defendant's third-party claims administrator contacted Ms. Elkins to inform her that the Defendant has "confirmed" PAH to her flanks (left and right), upper and lower abdomen, and inner thighs.

216. Ms. Elkins will need multiple invasive surgeries to try to remove PAH that developed on various parts of her body.

217. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Ms. Elkins's CoolSculpting provider was not adequately informed about the extent of the serious and permanent

adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

218. As the direct and proximate cause of Defendant's conduct, Ms. Elkins was not properly informed about PAH prior to undergoing CoolSculpting.

219. Had Ms. Elkins known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

220. Ms. Elkins's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

221. Plaintiff, **Lori-Ann Ridley** was interested in reducing stubborn fat on her back, often called "bra rolls." She began researching online for a non-invasive procedure that could help her do that. She found advertisements for CoolSculpting, which promised to reduce fat via a non-invasive procedure. Through the CoolSculpting website, she found a local CoolSculpting provider.

222. On November 26, 2018, Ms. Ridley visited Ideal Image located at 1485 Pine Ridge Rd. #1, Naples, FL 34109 to inquire about the CoolSculpting procedure.

223. At no point in time did anyone at Ideal Image tell Ms. Ridley, and she did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

224. Ideal Image sold Ms. Ridley a package of multiple cycles of CoolSculpting for use in the future.

225. On December 5, 2018, Ms. Ridley underwent two (2) cycles on her lower flanks.

226. On February 15, 2019, Ms. Ridley returned for an additional two (2) cycles on her upper flanks (bra area).

227. After the second session, Ms. Ridley did not see any results but began noticing that the area of treatment became harder and her skin appeared saggy.

228. She returned to Ideal Image and met with a nurse practitioner who examined her. The nurse practitioner, a CoolSculpting provider, agreed that the treated area felt harder but did not recognize that Ms. Ridley was beginning to develop signs of tissue damage from the CoolSculpting procedure. Ms. Ridley was sent home without any clue that she was beginning to develop an adverse effect of the CoolSculpting procedure.

229. Over the course of several months, Ms. Ridley's tissue continued to grow, but she did not understand what was happening to her body. Ms. Ridley eventually began doing her own research online, entering specific key terms into the search engine that described what she was experiencing after CoolSculpting.

230. On June 6, 2020, Ms. Ridley consulted with a plastic surgeon who diagnosed her with PAH on the *left* and *right side* of her back after CoolSculpting and performed laser liposuction on the affected area.

231. Ms. Ridley's liposuction was unsuccessful and *did not* remove deformities but left her with scars. Ms. Ridley continues to suffer from disfigurement to her body caused by CoolSculpting.

232. Ms. Ridley will need additional invasive surgeries to try to remove PAH and will be left with more scars.

233. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Ms. Ridley's CoolSculpting provider was not adequately informed about the extent of the serious and permanent

adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

234. As the direct and proximate cause of Defendant's conduct, Ms. Ridley was not properly informed about PAH prior to undergoing CoolSculpting.

235. Had Ms. Ridley known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

236. Ms. Ridley's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

237. Plaintiff, **Sheryl Dobbins**, was interested in a non-invasive procedure that could stubborn reduce fat in her midsection.

238. Ms. Dobbins saw advertisements for CoolSculpting, which promised to reduce fat without surgery and became interested in the CoolSculpting procedure.

239. On March 14, 2019, Ms. Dobbins visited AZURI Medical Rejuvenation & Aesthetics Center, a CoolSculpting provider, located at 300 W 41st Street, Suite 100, Miami Beach, FL 33140 to inquire about the CoolSculpting procedure.

240. Just like the CoolSculpting advertisements promised, Ms. Dobbins's CoolSculpting provider told her that she would see a 20-25% reduction in fat after the first session of CoolSculpting.

241. On March 21, 2019, Ms. Dobbins underwent six (6) cycles of the non-invasive CoolSculpting procedure, two (2) on flanks right side, two (2) on flanks left side, and two (2) on abdomen.

242. At no point in time did anyone at AZURI Medical Rejuvenation & Aesthetics Center tell Ms. Dobbins, and she did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

243. Several months after the CoolSculpting procedures, Ms. Dobbins began noticing that the treated areas of her body (abdomen and flanks) began getting larger, even though Ms. Dobbins lost weight.

244. On February 19, 2020, Ms. Dobbins returned to AZURI Medical Rejuvenation & Aesthetics Center and met with a plastic surgeon who was a CoolSculpting provider. The surgeon was not aware of PAH and was not able to diagnose her immediately.

245. On February 20, 2020, Ms. Dobbins was diagnosed with PAH by a nurse practitioner at AZURI Medical Rejuvenation & Aesthetics Center, on her *abdomen* and *each flank.*

246. On March 6, 2020, Ms. Dobbins was seen by another plastic surgeon, who recommended liposculpture and abdominoplasty to try to reconstruct her abdomen and flanks.

247. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Ms. Dobbins's CoolSculpting provider was not adequately informed about the extent of the serious and permanent adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

248. As the direct and proximate cause of Defendant's conduct, Ms. Dobbins was not properly informed about PAH prior to undergoing CoolSculpting.

249. Had Ms. Dobbins known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

250. Ms. Dobbins's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

251. Plaintiff, **Javier Valencia,** was advised about a non-invasive procedure to reduce stubborn fat on his upper flanks during one of his laser acne treatments on his shoulder at his dermatologist office.

252. Mr. Valencia read the CoolSculpting advertisements provided by the RN on the dermatologist office and became interested in the CoolSculpting procedure.

253. On July 24, 2018, Mr. Valencia visited Rafal Center for Dermatology & Cosmetic Surgery, a CoolSculpting provider, located at 2500 Nesconset Highway, Building 22A, Stony Brook, NY 11790 and underwent two (2) cycles of the CoolSculpting procedure, one on each of his upper flanks.

254. At no point in time did anyone at Rafal Center for Dermatology & Cosmetic Surgery tell Mr. Valencia, and he did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

255. Several months after the CoolSculpting procedure, Mr. Valencia began noticing that the treatment area started growing in size, even though Mr. Valencia kept losing weight.

256. Mr. Valencia developed protruding masses on his upper flanks where he had undergone CoolSculpting.

257. On January 11, 2019, he returned to his CoolSculpting provider and met with the supervising physician. The physician examined Mr. Valencia but did not know that he had developed an adverse effect of the CoolSculpting device. The physician was *not able* to diagnose him and offered to perform thermal treatments on the affected area, not understanding that PAH can only be removed with surgery.

258. After the thermal treatments did not work, the physician referred Mr. Valencia to a plastic surgeon. The plastic surgeon did not know about PAH and could not state a diagnosis.

259. Mr. Valencia began researching online for a plastic surgeon that had experience with adverse effects of CoolSculpting, and on December 9, 2019, he was finally diagnosed with PAH on his *right* and *left* upper flank by a plastic surgeon that had experience treating patients with PAH.

260. Mr. Valencia was advised that he would need an excision surgery on both of his flanks to cut out the affected tissue. He was told that although he would no longer have protruding masses, he would be left with large scars on both sides.

261. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Mr. Valencia's CoolSculpting provider was not adequately informed about the extent of the serious and permanent adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

262. As the direct and proximate cause of Defendant's conduct, Mr. Valencia was not properly informed about PAH prior to undergoing CoolSculpting.

263. Had Mr. Valencia known that there was a chance that he could develop a condition that results in the opposite effect of the device's advertised purpose, he would not have undergone the procedure.

264. Mr. Valencia's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

265. Plaintiff, **Paula Brooks**, was interested in a non-invasive procedure to reduce fat in her abdomen.

266. She had seen CoolSculpting advertisements in the past, and when her former employer purchased the CoolSculpting device, she was eager to undergo the procedure to address the stubborn fat.

267. On May 24, 2019, Ms. Brooks underwent the CoolSculpting procedure at Cape Cod Aesthetics and MediSpa located at 11 Potter Ave, Hyannis, MA 02601, where she had received three (3) cycles on her abdominal region.

268. Prior to undergoing to CoolSculpting procedure, Ms. Brooks was never advised by her CoolSculpting provider and did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

269. Ms. Brooks was told by her CoolSculpting provider that she may need additional cycles of CoolSculpting to achieve optimum results.

270. Ms. Brooks did not see any results from the CoolSculpting procedures and on August 8, 2019, Ms. Brooks visited Rhett Women's Center/Aesthetics located at 1300 Hospital Drive, Suite 130, Mt. Pleasant, SC 29464 for an additional two (2) cycles of the CoolSculpting procedure on her upper and lower abdomen.

271. At no point prior to undergoing the CoolSculpting procedures at Rhett Women's Center/Aesthetics was Ms. Brooks advised that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

272. In the months following the procedures, Ms. Brooks began noticing that her abdomen started growing in size and developing a large mass.

273. On October 28, 2019, she was diagnosed with PAH at the location of each of the CoolSculpting cycles, covering *her entire abdomen*.

274. Ms. Brooks sought out the evaluation and opinion of multiple plastic surgeons who agreed that the best course of action in reconstructing the affected area is through multiple surgeries, including abdominoplasty and liposuction.

275. On May 13, 2020, Ms. Brooks underwent abdominoplasty to try to correct the affected area. Due to the extent of tissue damage from CoolSculpting, her plastic surgeon had to make a long cut extending from her right to her left hip. She now has a scar traversing her lower abdomen. The surgery did not completely correct the affected area, and she will need additional reconstructive surgeries.

276. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Ms. Brooks's CoolSculpting providers were not adequately informed about the extent of the serious and permanent adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

277. As the direct and proximate cause of Defendant's conduct, Ms. Brooks was not properly informed about PAH prior to undergoing CoolSculpting.

278. Had Ms. Brooks known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

279. Ms. Brooks's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

280. Plaintiff, **Phornphan "Lisa" Chubchai**, was interested in a non-invasive procedure to reduce fat in her abdomen.

281. Ms. Chubchai saw advertisements for CoolSculpting, which promised to reduce fat without surgery and became interested in the CoolSculpting procedure.

282. On December 19, 2018, Ms. Chubchai visited Valley Legs Beauty & Diagnostics located at 1805 E Fir Ave, Suite 101, Fresno, CA 93720, and underwent two (2) cycles of the CoolSculpting procedure on abdomen area.

283. On April 17, 2019, Ms. Chubchai returned for an additional two (2) cycles on abdomen area.

284. On June 11, 2019, Ms. Chubchai completed her last two (2) cycles on abdomen area.

285. At some point, Ms. Chubchai also underwent cycles of CoolSculpting on both of her flanks at the same provider.

286. Prior to undergoing to CoolSculpting procedure, Ms. Chubchai was never advised by her CoolSculpting provider, and she did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

287. Several months after the CoolSculpting procedure, Ms. Chubchai began noticing that the fat tissue in her abdomen and flanks began growing and getting larger.

288. Ms. Chubchai complained to her CoolSculpting provider about her growing abdomen, but the supervising physician at Valley Legs Beauty & Diagnostics did not know about PAH or how to diagnose it. The provider was unable to diagnose her.

289. Ms. Chubchai was left to seek out another physician who could explain to her what she was experiencing and give her a diagnosis. She eventually found a knowledgeable plastic surgeon, and on January 29, 2020, she was diagnosed with PAH on her *abdomen* and *each flank*. Her plastic surgeon advised her that she will need abdominoplasty and liposuction to try to remove the disfigurement caused by PAH.

290. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Ms. Chubchai's CoolSculpting provider was not adequately informed about the extent of the serious and permanent adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

291. As the direct and proximate cause of Defendant's conduct, Ms. Chubchai was not properly informed about PAH prior to undergoing CoolSculpting.

292. Had Ms. Chubchai known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

293. Ms. Chubchai's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

294. Plaintiff, **Emily Michelle McGoldrick**, was interested in a non-invasive procedure that could reduce stubborn fat in various parts of her body.

295. Ms. McGoldrick saw advertisements for CoolSculpting, which promised to reduce fat without surgery and became interested in the CoolSculpting procedure.

296. On March 29, 2018, Ms. McGoldrick visited Healthy for Life Weight Loss & Nutrition Center, a CoolSculpting provider, located at 950 S. Arroyo Parkway, 3rd Floor, Pasadena, CA 91105.

297. Healthy for Life Weight Loss & Nutrition Center sold Ms. McGoldrick a package of multiple cycles of CoolSculpting for use in the future.

298. Over the course of six months, Ms. McGoldrick underwent multiple cycles of CoolSculpting during six appointments: March 29, 2018, April 9, 2018, May 28, 2018,

August 28, 2018, September 6, 2018, and October 22, 2018. The following areas of her body were treated: Left anterior thigh, left posterior thigh, right anterior thigh, right posterior thigh, right flank, left flank, left lower abdomen, and right lower abdomen.

299. Prior to undergoing to CoolSculpting procedure, Ms. McGoldrick was never advised by her CoolSculpting provider, and she did not know that the CoolSculpting device can cause damage to tissue, causing PAH and skin laxity.

300. Several months after the CoolSculpting procedures, Ms. McGoldrick started noticing that the areas of CoolSculpting treatment were beginning to increase, despite her vigilant diet.

301. Ms. McGoldrick complained to her CoolSculpting provider about her symptoms, but the physician at Healthy for Life Weight Loss & Nutrition Center did not understand that she was exhibiting signs of PAH after CoolSculpting. The CoolSculpting provider was unable to diagnose her, and she was left on her own.

302. The treated areas of her body continued to grow. Her inner thighs got so big that when she walks, they rub together and develop sores that turn into painful open wounds. She can no longer wear dresses and must only wear thick jeans, which develop holes and must be thrown out. Her flanks and abdomen have also got substantially larger, despite her weight loss.

303. For many months Ms. McGoldrick could not find a doctor that could diagnose her because most physicians were not familiar with PAH. After much searching, she was finally able to find a plastic surgeon that had experience with PAH and was able to diagnose her.

304. Ms. McGoldrick was diagnosed with PAH to all of the treatment areas. She must undergo multiple invasive procedures to try to remove the affected tissue and reconstruct her body.

305. As the result of Defendant's systemic failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting medical device, Ms. McGoldrick's CoolSculpting provider was not adequately informed about the extent of the serious and permanent adverse effect of CoolSculpting procedure called Paradoxical Adipose Hyperplasia (PAH) or Paradoxical Hyperplasia (PH) which requires surgical intervention to resolve.

306. As the direct and proximate cause of Defendant's conduct, Ms. McGoldrick was not informed about PAH prior to undergoing CoolSculpting.

307. Had Ms. McGoldrick known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

308. Ms. McGoldrick's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

## CLASS ALLEGATIONS

309. **Class Action Provisions:** Plaintiffs bring this action individually on behalf of themselves and all those similarly situated persons, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4).

310. **Definition of Class:**

   a. **Nationwide Class:** All individuals who purchased cycle(s) of the CoolSculpting procedure in the United States.

   b. **Nationwide Subclass:** All individuals who underwent the CoolSculpting procedure and suffered tissue damage in the form of Paradoxical Adipose Hyperplasia (PAH), also known as Paradoxical Hyperplasia (PH).

c.  **Excluded Persons:** Excluded from the putative class are: (i) Defendant, any entity in which Defendant has a controlling interest, and Defendant's legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendant's employees, officers, directors, agents and representatives, and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family. Plaintiff reserves the right to amend the class definition as appropriate after class discovery is completed.

311. **Numerosity:** The number of members of the Class is so numerous that individual joinder is impracticable. Tens of thousands of people purchased CoolSculpting cycle(s) in the United States. Thousands of people suffered PAH after undergoing the CoolSculpting procedure. The members of the Class can be identified through Defendant's records.

312. **Commonality and Predominance:** The Plaintiffs' and the Class members' claims involve important common questions of fact and law that predominate over any individual issues. The injuries sustained by each Plaintiff and Class member arose from the same policy and practice implemented by the Defendant in selling, promoting, advertising, and labeling the CoolSculpting medical device. The following questions are central to each Plaintiff and Class member's individual claims and resolving these common contentions in one class action will be an efficient and productive method of achieving a classwide resolution for thousands of similarly situated claimants.

313.  **Common Questions of Fact and Law:**

i.  Whether the CoolSculpting System was defective?

ii.  Whether Defendant had a duty to adequately warn CoolSculpting providers about the device's ability to cause harm?

    iii.  Whether Defendant failed to adequately warn CoolSculpting providers about the device's ability to cause harm?

    iv.  Whether Defendant intentionally misrepresented material facts about PAH to CoolSculpting providers?

    v.  Whether Defendant intentionally concealed material facts about PAH from CoolSculpting providers?

    vi.  Whether Defendant negligently misrepresented material facts about PAH to CoolSculpting providers?

    vii.  Whether Defendant negligently concealed material facts about PAH from CoolSculpting providers?

    viii.  Whether Defendant failed to use reasonable care in warning CoolSculpting providers about PAH?

    ix.  Whether Defendant's deceptive practices in regard to PAH were illegal?

314. **Typicality**: Plaintiffs' claims are typical of the claims of all members of the Class against the Defendant. The Plaintiffs' claims are based on the same or similar set of facts and legal theories against the Defendant that affect a much larger class of people who also purchased cycles of CoolSculpting and underwent the procedure. Each Plaintiff and Class member was the victim of Defendant's defective medical device, the Defendant's deceptive practices, and the Defendant's failure to adequately inform the CoolSculpting providers about the medical device's ability to cause serious and permanent harm to the Plaintiffs and the Class members. Consequently, the Plaintiffs and the Class members all suffered similar damages as the result of the Defendant's illegal conduct.

315. **Superiority.** A class action is a superior method of resolving the controversy between thousands of people that suffered similar injuries and economic damages after purchasing cycles of the CoolSculpting procedure and undergoing CoolSculpting due to the Defendant's illegal course of conduct which affected the Class members in the same way. Each claim is based on the same evidence and requires the same expert witnesses to prove the claims against the Defendant. A resolution of common questions of fact and law in one action based on the same evidence against the same Defendant will be economical for the claimants and the judicial system. A single class action on thousands of the same claims will avoid repetitive motion practice, inconsistent discovery rulings, multiple depositions of the same witnesses, cumulative expenses to obtain the same evidence, and delays in obtaining justice. Moreover, the Defendant will benefit from a single centralized action that will totally resolve the question of liability to thousands of claimants alleging the same claims.

316. **Injunctive Relief – Rule 23(b)(2)**. In addition to monetary damages, this action seeks injunctive relief against the Defendant which affects the Class as a whole. This class action seeks an order from the Court requiring Defendant to change the CoolSculpting device's labeling in regard to PAH and establish medical monitoring for persons that underwent the CoolSculpting procedure.

317. **Adequacy of Representation:** The Class Representatives will fairly and adequately represent the members of the Class. No material conflicts of interest exist between the Class Representatives and the members of the Class. The Class Representatives' interests are aligned with the interests of the members of the Class and the representatives' claims against the Defendant are common to the claims of the members of the Class. The Class

Representatives will actively participate in the litigation and intend to be involved in important decision making on behalf of the Class throughout the course of this litigation. Likewise, the undersigned class counsel selected by the Class Representatives to file this class action is competent to litigate the issues in this case, has in-depth knowledge about the issues in this case, and is currently litigating a case based on similar issues in the Middle District of Florida against the Defendant.

### COUNT I
### STRICT PRODUCT LIABILITY – DEFECTIVE DESIGN

318. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 317 of this Complaint as if fully set forth herein.

319. Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

320. Defendant intended that the subject product be used in the way in which it was used on the Plaintiffs.

321. Defendant's design of the CoolSculpting System medical device was unreasonably dangerous, unsafe, and/or defective for use on Plaintiffs at the time it left the Defendant's control as well as when it was used on Plaintiffs.

322. Defendant knew that its CoolSculpting System device was unreasonably dangerous, unsafe, and/or defective and could cause harm to those who used it, including Plaintiffs. Specifically, Defendant knew that its medical device can cause tissue damage and permanent deformity to the user's body in the form of Paradoxical Adipose Hyperplasia (PAH).

323. Defendant advertised CoolSculpting as a non-invasive procedure, designed to reduce fat. None of Defendant's advertising, marketing, or informational materials to the Plaintiffs, mentioned that CoolSculpting had the ability to cause a condition that results in a permanent disfigurement to the body that can only be resolved through invasive surgeries resulting in the *opposite effect* of the device's advertised purpose.

324. Plaintiffs relied on the skill and judgment of the Defendant and Defendant's representations that the device was adequately tested and rendered safe to use for its intended purpose.

325. Plaintiffs became interested in and underwent the CoolSculpting procedure based on the Defendant's representation about the procedure.

326. Because of the innate defective nature of the CoolSculpting System device, Plaintiffs and the individuals performing the CoolSculpting procedure on Plaintiffs, through the use of reasonable care could not have discovered the defective nature of the CoolSculpting System device or its perceived dangers.

327. As the direct and proximate result of Defendant's conduct, Plaintiffs sustained serious injuries that were directly caused by the defective, unsafe, and unreasonably dangerous CoolSculpting System device that could not safely be used for the purpose for which it was marketed, advertised, promoted and intended. Specifically, Defendant's CoolSculpting device caused Plaintiffs to suffer a permanent enlargement and hardening of fat tissue which can only be removed through invasive plastic surgery. Ultimately, Defendant's medical device caused Plaintiffs to suffer the exact outcome it promised to avoid.

328. Defendant is strictly liable for Plaintiffs' and the Class members' damages.

329. As the direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the members of the Class suffered and continue to suffer economic losses, emotional distress,

permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT II
## STRICT PRODUCT LIABILITY – FAILURE TO WARN

330. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 317 of this Complaint as if fully set forth herein.

331. Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

332. Defendant directly or through its agents, apparent agents, servants, or employees designed, manufactured, tested, marketed, and commercially distributed the CoolSculpting System device that was used on Plaintiffs.

333. Defendant knew that its CoolSculpting System device was unreasonably dangerous, unsafe, and/or defective and could cause harm to those who used it, including Plaintiffs. Specifically, Defendant knew that its medical device can cause the opposite effect of the device's advertised purpose in the form of Paradoxical Adipose Hyperplasia (PAH).

334. Defendant knew that PAH is not preventable and is unavoidable if undergoing the CoolSculpting procedure. Defendant also knew that there was a possibility that Plaintiffs could develop PAH after undergoing the CoolSculpting procedure.

335. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, had access to those person's medical records and information

regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

336. Defendant had a duty to provide adequate warnings about PAH, a dangerous adverse effect of its CoolSculpting medical device, to Plaintiffs' CoolSculpting providers.

337. Defendant failed to provide adequate warnings to Plaintiffs' CoolSculpting providers because the language used by Defendant to describe PAH in its training materials:

    a.   was inaccurate in content and ambiguous in manner of expression;

    b.   did not adequately inform the providers about a condition which is: 1) unfamiliar to the medical community, 2) is only associated with the CoolSculpting device, and 3) about which Defendant had superior knowledge;

    c.   creatively used insufficient and vague language that did not provide enough specificity about the condition, which was necessary for the CoolSculpting providers to know about the risks of using the device;

    d.   misrepresented facts about the adverse effect;

    e.   did not use concrete terms like "deformity" and "disfigurement" to describe PAH;

    f.   did not definitively state that PAH is a disease of the tissue;

    g.   did not definitively state that PAH can only be removed with invasive surgery;

    h.   did not warn that it is likely that multiple surgeries may be necessary to remove PAH;

    i.   did not disclose that a single patient can develop the condition in multiple areas;

    j.   did not disclose that PAH causes permanent cutaneous and subcutaneous tissue damage;

    k.   did not disclose that long term effects of PAH affected tissue are unknown;

l.  did not disclose that even with surgery, patients affected by PAH may still be left with deformities on their body; and

m.  used words such as "rare side effect" to imply that PAH is unlikely to occur, while knowing that the adverse event is not rare.

338. Defendant is strictly liable for Plaintiffs' and the Class members' damages because its product was defective due to its failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting devise.

339. As the direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the members of the Class suffered and continue to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

**COUNT III**
**NEGLIGENCE**

340. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 317 of this Complaint as if fully set forth herein.

341. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, performed its own research on PAH, had access to PAH patients' medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community. Likewise, Defendant controlled PAH diagnosis rate by instructing CoolSculpting providers not to mention PAH to patients

until the Defendant's claims department "confirmed" the providers' diagnosis and by systemically rejecting or refusing to confirm all of the providers' diagnoses.

342. The CoolSculpting providers acted as the Defendant's agents in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system, 2) shared profits with the providers on each cycle administered to patients, 3) provided forms and documents to the CoolSculpting providers with the CoolSculpting logo to use for CoolSculpting patients, 4) referred CoolSculpting patients to the CoolSculpting providers via its website, 5) controlled the advertised price of CoolSculpting, 6) controlled how patients were diagnosed with PAH resulting from CoolSculpting, and so on.

343. Defendant owed a duty to protect Plaintiffs from unreasonable risk of its CoolSculpting medical device which it knew had the ability to cause permanent injury resulting in the opposite effect of the device's advertised purpose.

344. **Duty to take Corrective and Preventive Actions.** Defendant had a duty to take corrective and preventive actions when it found out that its medical device causes permanent deformities to patient's bodies.

345. Defendant failed to exercise ordinary care when it: 1) failed to acknowledge that PAH is a *serious side effect* of the CoolSculpting device, and 2) failed to take corrective and preventive actions such as drafting proper labeling for the product that accurately and adequately describes PAH, updating its labeling for the product when if found out more information about the serious and permanent side effect associated with its medical device, or taking the device off the market to prevent harm to thousands of people.

346. **Duty to Inform Providers.** Defendant had a duty to adequately inform Plaintiffs' CoolSculpting providers that PAH, an adverse effect associated with Cryolipolysis and the CoolSculpting medical device: 1) causes cutaneous and subcutaneous tissue damage, 2) is a permanent deformity, 3) which will never resolve on its own, 4) which may affect a single patient in multiple treatment areas, 5) PAH requires multiple plastic surgeries, per affected area, to remove, 6) the effect of PAH is the opposite of the intended result of CoolSculpting, 7) that males are more likely to develop PAH, 8) the long term effect of the tissue damage from PAH is unknown, 9) that additional treatment in future may be required, 10) in some cases, plastic surgery will not resolve PAH.

347. Defendant failed to exercise ordinary care when it used misleading language in describing PAH to the CoolSculpting providers that did not adequately inform them about the seriousness of the condition and when Defendant concealed material facts about the condition from CoolSculpting providers. Defendant made ambiguous and inaccurate statements about the effect PAH has on the body, its permanency, treatment options, and rate of risk in the written materials it furnished to Plaintiffs' CoolSculpting providers.

348. Due to Defendant's failure to use ordinary care, Plaintiffs' CoolSculpting providers did not and could not adequately inform Plaintiffs and other CoolSculpting patients about the real risk of developing serious and permanent condition. Consequently, Plaintiffs and Class members were induced to purchase CoolSculpting cycles and undergo the CoolSculpting procedure and suffered economic damages and/or personal injuries as a result.

349. **Duty to be Honest in Advertising CoolSculpting.** Defendant also had a duty to be honest in its advertisement materials directed at Plaintiffs and Class members, such as

commercials, website content, and the brochures and posters that it furnished to the CoolSculpting providers to use in the office. Specifically, Defendant had a duty:

n.   Not to claim that the CoolSculpting procedure is a "non-invasive" and "non-surgical" alternative to liposuction;

o.   Not to claim that the CoolSculpting procedure produced "long lasting results";

p.   Not to claim that the CoolSculpting procedure "kills" fat cells;

q.   Not to claim that the CoolSculpting procedure results in "up to 20%-25% reduction of fat in a treated area";

r.   To disclose that the CoolSculpting procedure may cause the opposite effect of what it claims to achieve;

s.   To disclose that even after an initial reduction in fat, a person may develop the *opposite effect* (via PAH);

350. Defendant failed to exercise ordinary care when it made deceptive claims in its advertisement materials, which were directed at the Plaintiffs and the Class members, about the CoolSculpting device's effectiveness of reducing fat *without surgery* and omitted any information about the CoolSculpting's device's ability to cause the opposite effect.

351. Due to Defendant's failure to use ordinary care, Plaintiffs and Class members were not aware that by purchasing CoolSculpting cycles and undergoing the CoolSculpting procedure they were subjecting themselves to a risk of developing permanent deformities in the form of substantially increased and damaged fat tissue and skin laxity which requires multiple invasive surgeries to remove.

352. Consequently, Plaintiffs and Class members were induced to purchase and undergo the expensive CoolSculpting procedure and suffered economic damages and personal injuries.

353. As the direct and proximate result of Defendant's wrongful conduct, Plaintiffs and Class members suffered and continue to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

**COUNT IV**
**MEDICAL MONITORING**

354. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 317 of this Complaint as if fully set forth herein.

355. As the result of the Plaintiffs' and Class members' development of a serious and permanent condition, Paradoxical Adipose Hyperplasia, after undergoing the CoolSculpting procedure, the need for future monitoring is reasonably certain because the condition results in cellular damage, the long-term effect of which is currently unknown.

356. Even in those persons, whose affected tissue has been substantially removed via surgery, it is not certain that PAH will not return to the affected area in the future.

357. It is also unknown whether the development of PAH is correlated to other health issues that may develop or present themselves over time.

358. Therefore, medical monitoring is reasonable and necessary to preserve the health and wellness of those affected by Paradoxical Adipose Hyperplasia resulting from CoolSculpting.

359. Plaintiffs and the Class members are entitled to a medical monitoring program which will cover the future costs and related expenses of monitoring their health subsequent to developing PAH, and the Defendant is obligated to pay for such a program.

## COUNT VI
## NEGLIGENT MISREPRESENTATION AND CONCEALMENT

360. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 317 of this Complaint as if fully set forth herein.

361. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, performed its own research on PAH, had access to PAH patients' medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

362. The CoolSculpting providers acted as the Defendant's agents in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system, 2) shared profits with the providers on each cycle administered to patients, 3) provided forms and documents to the CoolSculpting providers with the CoolSculpting logo to use for CoolSculpting patients, 4) referred CoolSculpting patients to the CoolSculpting providers via its website, 5) controlled the advertised price of CoolSculpting, 6) controlled how patients were diagnosed with PAH resulting from CoolSculpting, and so on.

363. Defendant made these statements and concealed material facts about PAH without regard for the truth of the statements it was making.

364. **Severity.** Defendant knew that PAH is a disfigurement and a deformity to the body that is completely different from a normal "enlargement of fat" because PAH permanently damages the tissue it affects. Defendant also knew that many PAH patients also suffered

cutaneous tissue damage resulting in skin laxity, which requires additional surgeries to reconstruct. Defendant misrepresented the consequences of PAH to CoolSculpting providers by creatively using insufficient and ambiguous language to describe the condition and intentionally avoided using concrete terms that would fairly and accurately describe the adverse event.

365. **Permanency.** Defendant knew that PAH will *never* resolve on its own and that the *only* means of removing it is through invasive plastic surgery but instead, it used false language in describing PAH to CoolSculpting providers, downplaying the permanency of the condition and stating "surgical intervention *may* be required."

366. **Frequency.** Based on the number of PAH reports Defendant received, it knew that the likelihood of developing PAH after CoolSculpting was *not* rare. Defendant concealed its knowledge of the unreasonably dangerous risks of its CoolSculpting device from the CoolSculpting providers, while simultaneously relying on words "rare" and "small number" to induce CoolSculpting providers to believe that it is *unlikely* that a patient will develop the condition.

367. Defendant's intent in making material misrepresentations about PAH and concealing material information was motivated by profits. Because the majority of the Defendant's CoolSculpting profits are gained from the *use* of the device on consumers rather than sales of the device to the providers, Defendant's conduct was highly driven by consumers' purchase of the CoolSculpting cycles.

368. Defendant knew that the CoolSculpting providers' lack of knowledge and understanding about PAH will result in consumers being uninformed about the serious and permanent adverse effect. On the other hand, Defendant knew that if consumers knew that there was

a risk of developing the opposite effect of CoolSculpting's advertised purpose, consumers would not likely undergo the elective procedure.

369. As the result of Defendant's superior knowledge about PAH, CoolSculpting providers justifiably relied on Defendant's representations about the adverse effect solely associated with Defendant's medical device. Believing that the adverse effect is unlikely to occur and is not as serious and permanent, CoolSculpting providers did not properly inform CoolSculpting patients about the risk of PAH. Information regarding PAH was material and necessary for the Plaintiffs and the Class to make an informed decision about undergoing this elective procedure. Had the Plaintiffs and the Class known that there was a risk that they could suffer the *opposite effect* of the CoolSculpting device's advertised purpose, they would not have purchased cycles of CoolSculpting.

370. As the proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class suffered damages that include economic and non-economic losses.

## COUNT VI
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT

371. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 317 of this Complaint as if fully set forth herein.

372. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, performed its own research on PAH, had access to PAH patients' medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

373. The CoolSculpting providers acted as the Defendant's agents in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system, 2) shared profits with the providers on each cycle administered to patients, 3) provided forms and documents to the CoolSculpting providers with the CoolSculpting logo to use for CoolSculpting patients, 4) referred CoolSculpting patients to the CoolSculpting providers via its website, 5) controlled the advertised price of CoolSculpting, 6) controlled how patients were diagnosed with PAH resulting from CoolSculpting, and so on.

374. Defendant intentionally concealed and misrepresented important facts about the severity, permanency, and frequency of PAH in the device's labeling.

375. **Severity.** Defendant knew that PAH is a disfigurement and a deformity to the body that is completely different from a normal "enlargement of fat" because PAH permanently damages the tissue it affects. Defendant also knew that many PAH patients also suffered cutaneous tissue damage resulting in skin laxity, which requires additional surgeries to reconstruct. Defendant misrepresented the consequences of PAH to CoolSculpting providers by creatively using insufficient and ambiguous language to describe the condition and intentionally avoided using concrete terms that would fairly and accurately describe the adverse event.

376. **Permanency.** Defendant knew that PAH will *never* resolve on its own and that the *only* means of removing it is through invasive plastic surgery but instead, it used false language in describing PAH to CoolSculpting providers, downplaying the permanency of the condition and stating "surgical intervention *may* be required."

377. **Frequency.** Based on the number of PAH reports Defendant received, it knew that the likelihood of developing PAH after CoolSculpting was *not* rare. Defendant concealed its knowledge of the unreasonably dangerous risks of its CoolSculpting device from the CoolSculpting providers and the public, while simultaneously relying on words "rare" and "small number" to induce CoolSculpting providers to believe that it is *unlikely* that a patient will develop the condition.

378. Defendant's intent in making material misrepresentations about PAH and concealing material information was motivated by profits. Because the majority of the Defendant's CoolSculpting profits are gained from the *use* of the device on consumers rather than sales of the device to the providers, Defendant's conduct was highly driven by consumers' purchase of the CoolSculpting cycles.

379. Defendant knew that the CoolSculpting providers' lack of knowledge and understanding about PAH will result in consumers being uninformed about the serious and permanent adverse effect. On the other hand, Defendant knew that if consumers knew that there was a risk of developing the opposite effect of CoolSculpting's advertised purpose, consumers would not likely undergo the elective procedure.

380. As the result of Defendant's superior knowledge about PAH, CoolSculpting providers justifiably relied on Defendant's representations about the adverse effect solely associated with Defendant's medical device. Believing that the adverse effect is unlikely to occur and is not as serious and permanent, CoolSculpting providers did not properly inform CoolSculpting patients about the risk of PAH. Information regarding PAH was material and necessary for the Plaintiffs and the Class to make an informed decision about undergoing this elective procedure. Had the Plaintiffs and the Class known that there was

a risk that they could suffer the *opposite effect* of the CoolSculpting device's advertised purpose, they would not have purchased cycles of CoolSculpting.

381. As the proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class suffered damages that include economic and non-economic losses.

## PUNITIVE DAMAGES

382. Plaintiffs incorporate the substantive allegations contained in Paragraph 1 through 381 of this Complaint as if fully set forth herein.

383. Defendant's conduct in deceiving CoolSculpting providers and the public, including the Plaintiffs and the Class, about the seriousness, permanency, and frequency of Paradoxical Adipose Hyperplasia, concealing material information regarding the serious adverse effect of the CoolSculpting device was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

384. Defendant, as a corporation, actively and knowingly participated in the dissemination of misrepresentations and concealment of material information related to Paradoxical Adipose Hyperplasia and its CoolSculpting System device.

385. Therefore, Defendant is liable for punitive/exemplary/treble damages, as allowed by applicable state and federal laws.

## <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, respectfully request this Court enter a judgment:

1. Certifying the Classes described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Ordering the Defendant to pay compensatory damages to Plaintiffs and the Class for past and future economic and non-economic damages, including but not limited to pain and suffering, permanent disfigurement, economic loss, future medical expenses, mental anguish, and loss of enjoyment of life;

3. Ordering the Defendant to pay restitution of Defendant's profits earned from its wrongful conduct;

4. Ordering the Defendant to establish a medical monitoring program for persons that underwent the CoolSculpting procedure and exposed themselves to risk of developing PAH;

5. Ordering the Defendant to change labeling for the CoolSculpting medical device to reflect accurate information about Paradoxical Adipose Hyperplasia associated with the CoolSculpting device;

6. Ordering the Defendant to pay punitive/exemplary/treble damages for the wanton, willful, fraudulent and reckless conduct against Plaintiffs and the Class;

7. Ordering the Defendant to pay reasonable attorney's fees;

8. Ordering the Defendant to pay court costs; and

9. Granting any and all other relief the Court may deem just and proper.

<u>**DEMAND FOR A JURY TRIAL**</u>

Plaintiffs hereby demand a trial by jury on all issues raised in this Class Action Complaint.

**DATE FILED**: <u>August 27, 2020</u>          Respectfully Submitted,

*s/Louiza Tarassova*
By: Louiza Tarassova, Esq.
Florida Bar Number: 96149
LOU LAW
2180 N. Park Avenue., Suite 208

Winter Park, FL 32789
Telephone: (407) 622-1885
Fax: (407) 536-5041
E-Mail: louiza@mylawadvocate.com
Secondary E-Mail: service@mylawadvocate.com

*Counsel for Plaintiffs:*
*Amber Elkins,*
*Lori-Ann Ridley,*
*Sheryl Dobbins,*
*Javier Valencia,*
*Paula Brooks,*
*Phornphan "Lisa" Chubchai, and*
*Emily Michelle McGoldrick.*